1

2

3

4

5

6

7

8

9

Christopher D. Banys  (State Bar No. 230038)
Richard C. Lin         (State Bar No. 209233)
Jennifer L. Gilbert      (State Bar No. 255820)
cdb@banyspc.com
rcl@banyspc.com
jlg@banyspc.com
BANYS, P.C.
1032 Elwell Court, Suite 100
Palo Alto, California 94303
Telephone:  (650) 308-8505
Facsimile:   (650) 353-2202

Attorneys for Plaintiff
POTTER VOICE TECHNOLOGIES LLC

(*Additional counsel listed on signature page*)

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

OAKLAND DIVISION

13

14

POTTER VOICE TECHNOLOGIES LLC

15

                    Plaintiff,

16

v.

17

18

APPLE INC.,

19

                    Defendant.

20

Case No.  4:13-cv-01710-CW

**PLAINTIFF POTTER VOICE
TECHNOLOGIES LLC'S OPPOSITION
TO APPLE'S MOTION RE INVALIDITY
UNDER SECTION 101**

Date: May 28, 2015
Time: 2:00 p.m.
Courtroom: 2, 4th Floor
Judge: Hon. Claudia Wilken

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................................... 2

    A.   THE '659 PATENT TEACHES A SPECIALIZED DEVICE FOR CONTROLLING A COMPUTER WITH

    HUMAN VOICE. .................................................................................................... 2

    B.   THE STATE OF TECHNOLOGY IN 1995 ................................................................ 3

    C.   THE INVENTIVE CONCEPTS OF THE '659 PATENT ARE DESCRIBED IN THE CLAIMS ............... 5

III.    LEGAL STANDARDS ............................................................................................ 6

IV.     ARGUMENT ........................................................................................................... 8

    A.   THE CLAIMS ARE NOT DIRECTED TO AN ABSTRACT IDEA. ................................... 9

    B.   THE ASSERTED CLAIMS OF THE '659 PATENT EMBODY INVENTIVE CONCEPTS. ................. 11

    C.   THE CLAIMS OF THE '659 PATENT DO NOT PREEMPT THE ALLEGED ABSTRACT IDEA

    AND APPLE FAILS TO ADDRESS THIS FUNDAMENTAL CONCERN OF SECTION 101. ..................... 13

V.      CONCLUSION ...................................................................................................... 14

1

**TABLE OF AUTHORITIES**

2

C̲ASES̲

3  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). 7, 8, 1-14……………..7, 8, 10-14

4  *Allergan, Inc. v. Apotex Inc.,* 754 F.3d 952 (Fed. Cir. 2014) ....................................................................7

5  *Ameranth, Inc. v. Genesis Gaming Solutions, Inc., No.* SACV 11-00189 AG,

6    2014 U.S. Dist. LEXIS 175600 (C.D. Cal. Nov. 12, 2014) ....................................................10

7  *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336 (1961) ..................................10

8  *Bilski v. Kappos*, 561 U.S. 593 (2010)........................................................................................8

9  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir.2011) ................6

10  *California Inst. of Tech. v. Hughes Communications Inc.,* --F. Supp.3d --, Case No.

11    2:13-CV-07245-MRP-JEM, 2014 WL 5661290 (C.D. Cal. Nov 3. 2014) .................................8, 11, 13

12  *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011).........................11

13  *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir. 2003).....................6

14  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. Dec. 5, 2014)...............7, 8, 11, 12, 14

15  *Diamond v. Diehr*, 450 U.S. 175 (1981)..........................................................................7, 8, 10

16  *Fairfield Indus. v. Wireless Seismic, Inc.*, Case No. 14-CV-2972, 2014 WL 7342525

17    (S.D. Tex. Dec. 23, 2014)......................................................................................................14

18  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1989) ....................6

19  *Intellectual Ventures I LLC v. Manufacturer. & Traders Trust Co.*, Case No. 13-1274-SLR,

20    2014 WL 7215193 (D. Del. Dec. 18, 2014) ..........................................................................14

21  *Mayo Collaborative Serv. V. Prometheus Lab., Inc.*, 132 S. Ct. 1289 (2012)................................8, 10, 12

22  *McRo, Inc. v. Namco Bandai Games Am., Inc.*, Case No. No. CV 12–10322–GW (FFMx),

23    2014 WL 4749601 (C.D. Cal. Sep. 22, 2014) ......................................................................14

24  *Microsoft Corp. v. i4i Ltd. Partnership,* 131 S.Ct. 2238 (2011)............................................7, 8

25  *Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.*, Case No. C 08–04567 CW, 2010 WL 583960,

26    (N.D. Cal. Feb. 16, 2010) .......................................................................................................6

27  *O'Reilly v. Morse*, 15 How. 62, 14 L.Ed. 601 (1854)..............................................................14

28

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)...................................................6

*Research Corp. Techs., Inc. v. Microsoft Corp.,* 627 F.3d 859 (Fed. Cir. 2010) ...................................6, 14

*Syntex (U.S.A.) LLC v. Apotex Inc.*, Case No. C 01-02214 MJJ, 2006 WL 1530101

  (N.D. Cal. June 2, 2006)........................................................................................................6

*Ultramercial, Inc. v. Hulu, LLC*,  --- F.3d ----, 2014 WL 5904902 (Fed. Cir. Nov. 14, 2014) ....7, 8, 10, 13

*Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013)......................................................8

*Ultramercial, Inc. v. Hulu, LLC*, 134 S. Ct. 2870 (2014) .........................................................................8

STATUTES

35 U.S.C. § 282(a) ...................................................................................................................6, 7

Fed. R. Civ. Proc. 56(a) ...............................................................................................................6

1   I.   **INTRODUCTION**

2       The inventions of the '659 Patent advance the field of computer science and engineering in a way

3   that allows humans to speak to a computer and control it using their natural language—something

4   considered largely science fiction in 1995—and are exactly the type of innovations the patent system was

5   designed to encourage. First, the claims of the '659 Patent do not seek to exclude the public from the

6   alleged abstract idea of "finding information in a tabular data structure," and Apple's contention with

7   respect to the same is a complete debasement of the '659 Patent. The claims of the '659 Patent require a

8   microphone, a speech-to-text converter, associative search techniques, content determination based on

9   syntactic and semantic rules and conventions of natural language, tabular data structures for data storage,

10   and data processing using all of the foregoing, to permit a user to verbally interact with a computer. To

11   reduce the claims to a "table" and ignore the other essential elements is prohibited under *Alice*. Moreover,

12   nothing in *Alice* suggests that the use of a computer or computer-related concepts in a patent claim

13   transforms the subject matter into something abstract and patent ineligible.  Accordingly, there is no

14   abstract idea and the Court's analysis should stop here.

15       Second, the '659 Patent claims inventive concepts unknown at the priority date, concepts built on

16   a foundation of technology that was not well-understood, routine, or conventional, including specific

17   associative search and content determination techniques and combinations of the same. And even if the

18   claims rested on exclusively conventional components, the ordered combination of the elements of the

19   '659 Patent result in systems and methods that created a computer that can understand and respond to the

20   human's natural speech—concepts that are inventive by any measure.

21       Finally, *Alice*'s principal concern of preempting the building blocks of scientific and

22   technological work is notably absent in this case. The public is free to practice the alleged abstract idea of

23   "finding information in a tabular data structure" in countless ways while staying clear of the '659 Patent.

24   For instance, the public is free to find information in a table using a keyboard, mouse, touchpad, or

25   visually. And even if oral input is used, the public can find information in tables without a speech-to text

26   converter or absent the use of certain associative search or content determination techniques.  The PTO

27   already determined that the inventions in the '659 Patent were patent-eligible, and the patent must be

28   presumed valid.  In the end, Apple's cannot meet its high – "clear and convincing" – burden to show

1   otherwise.  Apple's motion should be denied.

2   **II.   FACTUAL BACKGROUND**

3        **A.  The '659 Patent Teaches A Specialized Device For Controlling A Computer With Human
4             Voice.**

5        The inventions of the '659 Patent "use[] oral input, natural language based rules, associative

6   searching and tabular data structures to provide an easily learned means for controlling a digital

7   computer." (Gilbert Decl., [1] Ex. A at 2:21-24).  These inventions employ "a means for receiving oral

8   input connected to a digital computer." (*Id.* at 2:34-35).  "The oral input is received by a microphone and

9   converted to digital input information representing each word of the oral input by a voice recognition

10  device." (*Id.* at 2:46-48).  "The input information is then used to associatively search the contents of a

11  tabular data structure organized in rows and columns. The row or rows which contain the largest number

12  of data elements equivalent to the elements of the word group are identified." (*Id.* at 2:48-53).  Thus, the

13  computer determines the intended meaning of the spoken words by the human.  For example, Claim 22

14  recites:

15        22.  An ***apparatus for using oral input to control a digital computer***, comprising:

16        (a)  receiving means for ***receiving oral input***;

17        (b)  ***word recognition*** means, operatively associated with said receiving means, for
             ***generating input information***;

18        (c)  a ***digital computer***, operatively associated with said word recognition means;

             Apple's alleged "abstract idea"
19        (d)  ***storage*** means, located within said digital computer, for ***storing data in a tabular
20             data structure***;

21        (e)  search means, located within said digital computer, for ***associatively searching said
             tabular data structure***, comprising means for i***dentifying labels*** within said tabular
22           data structure ***which relate to at least a first part of such input information***;

23        (f)  content determination means, located within said digital computer, for ***determining
             content information*** relating to input information; and

24        (g)  processing means, located within said digital computer, for ***processing data***.

25  (*Id.* at Claim 22).  Claim 4 adds the functionality of identifying an operation to be performed (once the

26  meaning of the language is determined) and performing it.  (*Id.* at Claim 4).  Claim 6 adds the

27

28  ---
    [1] References herein to "Gilbert Decl." refer to the Declaration of Jennifer L. Gilbert submitted
    concurrently with this opposition.

1  functionality of providing a follow up request to the human operator based on the initial request or

2  command, and Claim 7 requires that the words comprise a verb and a noun (*e.g.*, "Place a call to Hal").

3  (*Id.* at Claims 6 and 7).  And Claims 23 and 24 add the ability for the computer to talk back to you based

4  on your command. (*Id.* at Claims 23 and 24).

5  **B.   The State of Technology In 1995.**

6  As of the priority date of the '659 Patent, the entire concept of being able to control and interact

7  with a computer through natural language speech was considered science fiction — a concept embraced

8  by fans of Star Trek and the Space Odyssey series.  Although HAL[2] from *2001: A Space Odyssey* and the

9  Federation Starship USS Enterprise[3] from *Star Trek* could be controlled by natural human voice, such

10  technology was Hollywood fiction in 1995.  In fact, over ten years later, when the developers at SRI

11  International first started and named the project that eventually became the accused product Siri,[4] they

12  chose to call the product "HAL." (Gilbert Decl., Ex. B).   SRI even marked certain confidential

13  documents as proprietary and, as part of the designation, quipped "[a]buse it and HAL will find you."  *Id.*

14  To be sure, in as late as 2007, designing a voice control system for computers using natural language was

15  difficult even for those working at the Stanford Research Institute.  *Id.*

16  In 1995, however, Dr. Jerry Potter invented a way of bringing into reality something considered

17  fantastical by most.   He did so by combining new and unconventional technology with existing

18  technology, and some American ingenuity, to create the novel inventions described in the '659 Patent.

19  One of the many technological features of the '659 Patent relates to tabular data structures.  The

20  tabular data structures referred to in the '659 Patent are digital structures accessible through software.

21  And while it is possible to conceive of these structures by analogy to older, physical tables, like those

22  used to track grain stores on parchment in ancient times, the tabular data structures at issue exist digitally,

23  are rendered by electrons fired through computer hardware as directed by specialized code.  These digital

24  tabular data structures are as far removed from paper tables as a supersonic jet is from a mule.

25
─────────────────────────────

26  [2] HAL is a computer that is infamous for turning against the crew of the spaceship that it controlled in the book (and later movie) *2001: A Space Odyssey*. http://en.wikipedia.org/wiki/HAL_9000

27  [3] Certain models of the USS Enterprise's onboard computer responded to natural language speech in the Star Trek series.  http://en.wikipedia.org/wiki/Majel_Barrett#Star_Trek

28  [4] Apple acquired Siri from Siri, Inc. (a spin-off of SRI International) in April of 2010.  (*See* Gilbert Decl., Ex. C at p. 22-23).

Importantly, the '659 Patent does not claim the mere concept of tables, or even the idea of tabular data structures in a digital computer. Instead, where the Patent teaches tabular data structures, it claims a new way of electronically searching these structures – associative search. The '659 Patent defines associative search as "a technique of accessing or identifying an entire datum from a body of data by specifying a portion of the datum." (Gilbert Decl., Ex. A at 3:4-6).

The benefits of associative search over conventional methods can include: "eliminat[ing] the need for pointers, linked lists, sorted data and other complex data structures, which are required by sequential processors for fast, efficient data processing." '(Gilbert Decl., Ex. A at 6:46-49). Dynamic modification and use in parallel processing are additional available benefits. (*Id.* at 6:49-52). In contrast, in 1995 the conventional practice for constructing and then searching, accessing, and editing digitized tables was to use spreadsheets, database tables, an n-dimensional arrays of data (*e.g.* aa[i][j]). (*Id.* at 6:34-39. "Typically, these data formats are address based and the location of an element is specified by an address in a one-dimensional sequential memory." (*Id.* at 6:39-41). Dr. Potter, however, approached the problem in a new way — using associative search, which was something far from conventional or routine.

The '659 Patent uses associative search techniques to search the contents of digitized tabular data structures. (*See* Gilbert Decl., Ex. A at 2:46-54; 3:4-14). Prior to the priority date of the patent, there had been efforts in the research community to build special computing hardware to support associative knowledge representation and processing. (*See* Gilbert Decl., Ex. D at POTTER0000038). However, the use of the theory of associative processing had not been incorporated into a programming language. (*See* Gilbert Decl., Ex. E at POTTER0000529). In fact, the use of associative search as a computing paradigm was just being introduced in late 1994 and 1995. (Gilbert Decl., Ex. D at POTTER0000038). Dr. Potter was one of the first to introduce this computing paradigm to the world. (Gilbert Decl., Exs. D at POTTER0000038 and E at POTTER0000529). As such, at the time Dr. Potter filed the '659 Patent, these associative techniques for enabling content-addressable access to digitized tables were not well understood, were not conventional, or routine, and were certainly not in common use.

In conjunction with this associative search, the oral input information in the '659 Patent is "analyzed to determine the content information of the words." (Gilbert Decl., Ex. A at 2:53-54). This technology was also new as of the priority date. In 1995, "problems [we]re particularly evident when

attempting to control computers using oral or spoken input as a substitute for keyboard or pointer entry. Cryptic commands which may be efficient to enter using a keyboard may be difficult to pronounce or cause awkward speech patterns."[5]   (*Id.* at 1:52-56).   Accordingly, the conventional approaches to controlling computers using oral input were problematic.  (*Id.* at 1:15-65).  However, in the '659 Patent, content information is determined by the use of rules derived from syntactic and semantic rules, and through conventions of natural language.  (*Id.* at 2:55-60).  This use of content determination in conjunction with associative search was not conventional, routine, or well known, and in fact, was inventive. (*Id.* at 1:15-65).

### C.  The Inventive Concepts of the '659 Patent Are Described in the Claims.

As noted above, existing systems had attempted to build spoken language control capability based upon the conventional table storage and access methods. (Gilbert Decl., Ex. A at 6:34-39).   These systems resulted in a constrained and robotic-like experience for the user.  (*Id.* at 1:18-65).  The whole point of the '659 Patent is that by applying associative computing methods in conjunction with content determination techniques based on linguistic rules, you make a very large, marked improvement in the type and quality of spoken user interface you can provide for controlling digital computers.  (*Id.* at 2:11-33).  Claims 1, 4, 6, 7, and 22-24 of the '659 Patent (the "Asserted Claims") address the core of this approach and articulate specific ways that associative computing techniques can be used to achieve the new and innovative method for spoken language control of digital computers disclosed in the '659 Patent.

Specifically, the Asserted Claims use associative computing applied to natural language processing to control a digital computer using a human's natural speech patterns as oral input.  The '659 Patent's spoken language control is based upon a bedrock of associative representation and content determination, which allows a spoken language interface to the digital computer to be used to control the computer.  (Gilbert Decl., Ex. A at 5:6-37).   The methods and systems of the '659 Patent: (1) accept natural language as input; (2) through a microphone; (3) process that natural language using a speech-to-

---

[5] For example, a user navigating through a series of menus would have to articulate a strong such as "two – enter – (pause) – four – enter – (pause) – one – enter – (pause) – one – enter" or a user may have to say "D – I – R – space – C – colon – backslash – M – Y – D – I – R backslash – asterisk – dot – A – B – C – enter" to get to find all files in a database that relate to "ABC."  (*See* Gilbert Decl., Ex. A at 1:56-65).

text converter; and then (4) by using associative searching and content determination based on syntactic and semantic rules and conventions of natural language; (5) control the computer based on the oral input (*e.g.*, a command); and (6) audibly convey the results or ask for more information. (*See Id.* at Claims 1, 4, 6, 7, and 22-24).  Put simply, the computer figures out what it was told to do and does it — just like HAL or the computers aboard the Starship Enterprise.

## III.    LEGAL STANDARDS

From a procedural standpoint, Apple has failed to specify whether it has moved to dismiss, moved for judgment on the pleadings, or moved for summary judgment.  *See* Dkt. No. 408, at 5.  In any event, summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  At summary judgment, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The standard for a Rule 12(c) motion for judgment on the pleadings is the same as for motions to dismiss brought under Rule 12(b)(6).  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n. 4 (9th Cir.2011).  For purposes of a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1989).  Judgment on the pleadings is improper unless the moving party "clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios*, 896 F.2d at 1550.

Section 101 is a "coarse eligibility filter" that leaves other sections of the Patent Act to filter out inventions that lack novelty, are obvious, or are inadequately described.  *Research Corp., Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010).  Moreover, each claim is entitled to a presumption of validity independently from that of the other claims, and the party challenging the validity of a patent must address each claim individually.  35 U.S.C. § 282(a); *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370-1371 (Fed. Cir. 2003); *Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.*, Case No. C 08–04567 CW, 2010 WL 583960, *7 (N.D. Cal. Feb. 16, 2010); *Syntex (U.S.A.) LLC v.*

*Apotex Inc.*, Case No. C 01-02214 MJJ, 2006 WL 1530101, *26 (N.D. Cal. June 2, 2006).  When the validity of an issued patent is challenged under §101, the presumption that the patent is valid remains and the party challenging validity bears the heavy burden of overcoming this presumption by clear and convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. Partnership,* 131 S.Ct. 2238, 2242-2243, 2245, (2011); *Allergan, Inc. v. Apotex Inc.,* 754 F.3d 952, 958 (Fed. Cir. 2014).

In *Alice*, the Supreme Court set forth a two-part test to evaluate patent eligibility under 35 U.S.C. § 101.  In the first step, a court must "determine whether the claims at issue are directed to one of those patent ineligible concepts," namely, a law of nature, physical phenomenon, or abstract idea.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). If the claim is directed to one of these concepts, then the Court must determine whether the claim has an "'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal citations and quotations omitted). "[T]he concern that drives this exclusionary principle is one of pre-emption." *Alice*, 134 S.Ct. at 2354. That concern requires a careful balance:   while "[m]onopolization" of "[l]aws of nature, natural phenomena, and abstract ideas"—the "basic tools of scientific and technological work"—would "tend to impede innovation more than it would tend to promote it," it is also true that too broad an application of "this exclusionary principle" would "swallow all of patent law," as "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id*. (quotations omitted).

The Supreme Court and Federal Circuit have made clear that software and business methods remain eligible for patent protection.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255-56 (Fed. Cir. Dec. 5, 2014); *Ultramercial, Inc. v. Hulu, LLC*,  --- F.3d ----, 2014 WL 5904902, *4 (Fed. Cir. Nov. 14, 2014).  Indeed, the *Alice* Court recognized that the use of a computer to "improve the functioning of the computer itself" or to "effect an improvement in any other technology or technical field" is patent-eligible subject matter.  *Alice*, 134 S.Ct. at 2359; *see also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) ("[A] claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a . . . computer program, or digital computer.").

The Federal Circuit has recently emphasized that "the analysis under § 101, while ultimately a

1  legal determination, is rife with underlying factual issues." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d

2  1335, 1339 (Fed. Cir. 2013), *vacated on other grounds*, 134 S.Ct. 2870 (2014). The Federal Circuit has

3  identified many reasons the § 101 inquiry is inherently fact specific:

> [T]here is no doubt the § 101 inquiry requires a search for limitations in the claims that narrow or tie the claims to specific applications of an otherwise abstract concept. Further, factual issues may underlie determining whether the patent embraces a scientific principle or abstract idea. ***If the question is whether "genuine human contribution" is required, and that requires "more than a trivial appendix to the underlying abstract idea," and were not at the time of filing "routine, well-understood, or conventional," factual inquiries likely abound. Almost by definition, analyzing whether something was "conventional" or "routine" involves analyzing facts. Likewise, any inquiry into the scope of preemption – how much of the field is "tied up" by the claim – by definition will involve historic facts: identifying the "field," the available alternatives, and preemptive impact of the claims in that field***.

10  *Id.* (internal citations omitted) (emphasis added).

11  Finally, Section 101 is "only a threshold test." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *Mayo*

12  *Collaborative Serv. v. Prometheus Lab., Inc.*, 132 S. Ct. 1289, 1304 (2012).  For instance "conventional

13  elements do not constitute everything in the prior art." *Cal. Inst. of Tech. v. Hughes Comms. Inc.,* --F.

14  Supp.3d --, Case No. 2:13-CV-07245-MRP-JEM, 2014 WL 5661290, at *14 (C.D. Cal. Nov 3. 2014).

15  To be sure, "conventional elements and prior art may overlap" any "conventional element" is almost

16  certainly within the prior art for purposes of obviousness.  *Id.*  But the prior art contains in addition many

17  concepts that, while relevant to a patent's validity under Sections 102 and 103, are not "conventional"

18  within the meaning of *Alice, Mayo Clinic*, and their progeny.   As the Supreme Court has held since

19  *Diehr*, "conventional" in the context of Section 101 means "'conventional industry practice.'" *Alice,* 134

20  S.Ct. at 2358 (quoting *Diehr*, 450 U.S. at 178). Activity is "conventional" only where it is "known to the

21  industry."  *Id.* at 2358-59.  And "conventional" is not the only limiting factor; to discount the activity in

22  conducting the Section 101 analysis, it must also be "well-understood" and "routine." *Alice*, 134 S.Ct. at

23  2359.  Only "routine and conventional" activity is disregarded under Section 101.  *DDR Holdings*, 773

24  F.3d at 1259; *see also Ultramercial*, 772 F.3d at 715.  Thus, other issues concerning validity, including

25  novelty and non-obviousness must be treated separately.  *Microsoft Corp.*, 131 S.Ct. at 2242.

26  **IV.   <u>ARGUMENT</u>**

27  Relying on attorney argument, rather than actual facts, Apple attempts to miscast the inventions

28  of the '659 Patent as merely a way of "finding information in a tabular data structure."  Dkt. No. 408, at

7.  But Apples mischaracterization is so broad that it has no meaningful relationship with what is *actually* claimed in the '659 Patent.  Indeed, the facts are the opposite of Apple's arguments: the '659 Patent unambiguously claims a new device for converting oral input into text that a computer can use.

A simple review of the claims above makes it apparent that Apple's proposed abstract idea of "finding information in a tabular data structure" would ignore all but element (d) of representative Claim 22.[6]  Yet, the inventions are much more than that.  To illustrate, Figure 6 presents the major components of an apparatus according to the '659 Patent:



(Gilbert Decl., Ex. A at Fig. 6; col. 4:34-35 (describing Figure 6)).  Again, Apple's alleged abstract idea only captures element 120 in Figure 6 above.  Instead of addressing the claims as a whole, Apple takes a single limitation of the invention (a table), to the exclusion of the rest of the invention, magnifies it in degree and importance, and calls it the "abstract idea."

Apple's proposed abstract idea completely ignores the fact that — even though a tabular data structure is used — the inventions provide a way for a human to control a digital computer using his or her natural language, as opposed to a discrete set of arcane commands.  (Gilbert Decl., Ex. A at 2:21-24; 2:34-35; 2:46-48).  In other words, the inventor created a way for humans to control a computer by speaking to it as if they were speaking to another human.  (*Id.* at 2:21-24; 2:34-35; 2:46-48).  To accomplish this, it is fairly obvious that much more than a table is needed.

**A.  The Claims Are Not Directed to an Abstract Idea.**

Apple mischaracterizes the Asserted Claims as being directed to finding information in a table and, in

---

[6] Potter Voice disagrees with Apple's assertion that Claim 1 is representative.  However, even in the context of Claim 1, Apple ignores all but a portion of element (d).

doing so, omits vital parts of the claims, despite case law explicitly rejecting this approach.   In fact, Apple's alleged abstract idea is so broad it would swallow any invention that used a table.   In determining whether claims are directed to patent-eligible subject matter, the Supreme Court has long emphasized "the general rule that patent claims '***must be considered as a whole***.'" *Alice,* 134 S. Ct. at 2355 n.3 (*quoting Diehr*, 450 U.S. at 188) (emphasis added).   A characterization of the patent claims – like Apple's here – that omits limitations or steps, or seeks to recast the actual language of the claim, should be rejected for purposes of a § 101 analysis. *See, e.g., Ameranth, Inc. v. Genesis Gaming Solutions, Inc., No.* SACV 11-00189 AG, 2014 U.S. Dist. LEXIS 175600, at *16-19 (C.D. Cal. Nov. 12, 2014) (denying summary judgment motion under § 101, *inter alia*, because defendant's characterization of invention omitted claim limitations).   Similarly, it is inappropriate to evaluate patent eligibility based on an invention's purported "essence" or "gist." *Ultramercial*, 722 F.3d at 1344; *see also Mayo*, 132 S. Ct. at 1293 ("all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."); *see Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 345 (1961) ("there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention").

Contrary to this long-standing law, Apple simply ignores important claim elements in order to portray the claims as simply the process of "finding information in a tabular data structure."   Dkt. No. 408, at 7.   In short, Apple chose a single limitation of the patent (a table), and represents it as being the "gist" or "essence" of the claims.   *C.f., Aro Mfg.,* 365 U.S. at 345.



Fig. 6

(*See* Gilbert Decl., Ex. A at Fig. 6); *see, also*, the Asserted Claims.   This type of mischaracterization is

improper under §101 jurisprudence.  Moreover, there is simply no evidentiary support for Apple's claim. Each of the Asserted Claims require at least a microphone, a word recognition device, associative searching, content determination, a tabular data structure, and the ability to process data.  As a result, Apple's straw-man "abstract idea" is simply wrong.

Moreover, patent claims directed to a technological problem specific to the digital environment do not implement any abstract idea.  Thus, when the digital environment "introduces a problem that does not arise in the 'brick and mortar' context" and the claim is directed at solving that particular problem, it typically is not an abstract idea.  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014).  For the same reason, a claim that "presents functional and palpable applications in the field of computer technology" is not excluded by Section 101.[7]  *Research Corp. Techs.*, 627 F.3d at 868. "[P]atents should encourage inventors to create new computing solutions to today's computing problems. . . . [I]t at least must be true that § 101 protects a unique computing solution that addresses a unique computing problem." *Cal. Inst. of Tech.*, 2014 WL 5661290, at \*20.

The inventions of the '659 Patent are certainly a unique solution to a unique computer problem.  In fact, the problem of controlling a computer with a human's native language exists exclusively in the realm of computers.   The fact that the Asserted Claims of the '659 Patent use tabular data structures to help enable this technology is of no consequence.  "At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus an invention is not rendered ineligible simply because it involves an abstract concept.  Applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Alice*, 134 S.Ct. at 2354.  Apple has failed to demonstrate that the Asserted Claims cover an abstract idea, and the Alice analysis should end here.

**B. The Asserted Claims of the '659 Patent Embody Inventive Concepts.**

The Asserted Claims of the '659 Patent are directed to inventive concepts necessarily rooted in

---

[7] The Federal Circuit has also found claims to be patent eligible in "cases where, as a practical matter, the use of a computer is required to perform the claimed method," including claims involving "the manipulation of computer data structures" or "the output of a modified computer structure" where "the method could not, as a practical matter, be performed entirely in a human's mind."  *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1376 (Fed. Cir. 2011) (discussing the patent-eligible claims in *Research Corp. Techs.*, 627 F.3d at 868); *see also DDR Holdings*, 773 F.3d at 1257 (finding claim patent eligible where "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks").

computer technology and use non-conventional, non-generic components as part of those inventive concepts. Under *Alice*, if a claim falls into one of the exceptions to patent eligible subject matter, then Step 2 of the analysis requires that each element of the claim be further evaluated both individually and in an ordered combination to determine whether the elements transform the abstract idea such that the subject matter is patentable. *Alice*, 134 S.Ct. at 2355. A claim contains the requisite "inventive concept" if it comprises more than "well-understood, routine, conventional activity already engaged in by the scientific community." *Mayo*, 132 S.Ct. at 1298. A claim directed to an abstract idea may nevertheless remain a patent-eligible application of that abstract idea by, for example, improving upon existing technology or integrating the abstract idea into a new combination of steps in a way that is unconventional in the field. *Id.* at 1298-1300.

Apple's analysis in Step 2 ignores the inventive concepts of the '659 Patent and fails to consider the components in an ordered combination as required by the *Alice* line of cases. At the outset, the Asserted Claims employ inventive concepts to enable a human to control a computer using natural language. Conventional systems attempted to build spoken language control capability based upon the conventional table storage and access methods which resulted in a robotic experience for users. By applying associative computing methods in conjunction with content determination techniques based on linguistic rules, Dr. Potter created new computing solutions to the unique computing problems of 1995. *Id.*; *c.f., DDR Holdings*, 773 F.3d 1245, 1256-57. Specifically, Dr. Potter's used associative computing techniques in conjunction with content determination to enable control of a digital computer using the human's natural speech patterns.

Moreover, to implement the inventive concepts of the Asserted Claims, the '659 Patent uses associative search techniques to search the contents of digitized tabular data structures. (*See, e.g.,* Gilbert Decl., Ex. A at 2:46-54; 3:4-14). Dr. Potter was one of the first to introduce the use of associative search as a computing paradigm in 1994. These associative techniques for enabling content-addressable access to digitized tables were anything but conventional or generic at the filing date, and they were distinct from conventional search means. (*See, e.g.,* Gilbert Decl., Ex. A at 2:46-54; 3:4-14). In conjunction with this associative search, the oral input information in the '659 Patent is "analyzed to determine the content information of the words." (*Id.* at 2:53-54). This technology was new. Dr. Potter developed it because

conventional approaches to human control of computers were inadequate due to the cryptic language prior systems employed. The '659 Patent addressed this problem by using rules derived from syntactic and semantic rules to determine content information. (*Id.* at 2:53-54). This use of content determination in conjunction with associative search was neither conventional nor generic. (*Id.* at 1:15-65).

Finally, the "ordered combination" of the elements claimed by the Asserted Claims are inventive. If a claim is directed to an abstract idea, then the Court must still determine whether the claim has an inventive concept in the form of a "combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S.Ct. at 2355. Apple's approach of examining each individual claim limitation, dismissing it as old technology, and then concluding that nothing patentable is left is impermissible under §101. If it were proper to conduct a § 101 analysis based upon a simplified distillation or summary of claim language, then virtually no claim would pass muster, as "any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed." *Ultramercial,* 722 F.3d at 1344. Taken together, the methods and systems of the '659 Patent accept natural language as input through a microphone, process that natural language using a speech-to-text converter, and then, by using associative searching and content determination based on syntactic and semantic rules and conventions of natural language, control the computer based on the oral commands. The dependent claims add the ability to perform a command based on the input, provide a follow up request to the human operator, and the ability for the computer to talk back to the human. The resultant systems and methods invented a computer that can understand and respond to the natural speech of a human. Such concepts are indisputably inventive and far removed from the concept of simply "finding information in a table."

**C. The Claims of the '659 Patent Do Not Preempt the Alleged Abstract Idea And Apple Fails to Address This Fundamental Concern of Section 101.**

A computer that interacts with humans using their natural language does not preempt the idea of "finding information in a table." Although a paramount concern underlying § 101 is preemption, "[b]y definition, every patent preempts an area of technology." *Cal. Inst. of Tech.*, 2014 WL 5661290, at *12; *see, also, Alice*, 134 S.Ct. at 2354. "[W]e must be wary of facile arguments that a patent preempts all

1   applications of an idea. It may often be easier for an infringer to argue that a patent fails § 101 than to

2   figure out a different way to implement an idea . . . ." *McRo, Inc. v. Namco Bandai Games Am., Inc.*,

3   Case No. No. CV 12–10322–GW (FFMx), 2014 WL 4749601, *7 (C.D. Cal. Sep. 22, 2014) (*quoting*

4   *O'Reilly v. Morse*, 15 How. 62, 113, 14 L.Ed. 601 (1854)).   Where patent claims are directed to a

5   particular technological improvement in a particular field, and do not attempt to cover the field itself,

6   there is no risk of preemption. *See, e.g.*, *DDR Holdings*, 773 F.3d at 1259 (claims did not preempt every

7   application of the idea of increasing sales by making two web pages look the same because they recited a

8   specific way to automate the creation of a composite web page); *Intellectual Ventures I LLC v. Mfr. &*

9   *Traders Trust Co.*, Case No. 13-1274-SLR, 2014 WL 7215193, *9 (D. Del. Dec. 18, 2014) (claims

10  recited a specific method of customizing web pages and therefore did not preempt all applications of

11  creating custom websites); *Fairfield Indus. v. Wireless Seismic, Inc.*, Case No. 14-CV-2972, 2014 WL

12  7342525, *6 (S.D. Tex. Dec. 23, 2014) (claim did not preempt the idea of a relay system because it built

13  upon this concept by adding nonconventional elements, such as the assignment of different transmission

14  parameters to avoid jumbled communication). The '659 Patent does not preempt the idea of finding

15  information in a table, or even the idea of finding information in a digitized table.  For instance, the

16  public can still find information in a table using a keyboard, touchpad, mouse, or visually.  Or it could do

17  so without a speech-to text converter.

18      Indeed, Apple has argued in this very case that it could use oral input to the computer without

19  associative search or content determination techniques without violating the patent. (Gilbert Decl., Ex. C

20  at 3-14).   There are literally endless ways that the public can still find information in a table without

21  falling within the scope of the Asserted Claims. As such, the claims do not preempt any "basic tools of

22  scientific and technological work" such that there is a risk of preemption.  *Alice,* 134 S.Ct. at 2354.

23  **V.   <u>CONCLUSION</u>**

24      In 1995, Dr. Potter invented a new and revolutionary device that allowed a human to control a

25  computer using natural language commands.  The inventions in the '659 patent are complex and directed

26  to solving critical problems in the computer environment – problems that left true human voice-computer

27  interface to the realm of science fiction.  But Apple argues that the patent is little more than an

28  abstraction – and cannot pass even the "coarse filter" of Section 101.  Apple does so by distilling and

then reconstructing the patent into a straw man – focusing on a table at the exclusion of many other

inventive parts of the invention.  And Apple even ignores one of the important aspects of invention – not

the table itself but the associative search of that table that allows the computer to function in a way that

allows the science fiction of voice control to become reality.  Apple's approach violates the rules laid

down in *Alice* for evaluating Section 101 patentability.  The evidence shows that Dr. Potter developed a

new and unique solution to a problem that long vexed computer science. A solution that, Potter alleges,

can be found in Apple's Siri – a product used by millions and touted by Apple itself as a breakthrough in

the way we interact with electronic devices.  Far from an abstraction, Potter's patent is a breakthrough in

modern computing.  Apple cannot meet its heavy burden to show otherwise and its Motion should be

denied.


Dated: April 3, 2015                                    Respectfully submitted,


                                                        */s/ Christopher D. Banys*
                                                        Christopher D. Banys

                                                        BANYS, P.C.
                                                        Christopher D. Banys          (SBN 230038)
                                                        Richard C. Lin                (SBN 209233)
                                                        Jennifer L. Gilbert           (SBN 255820)
                                                        BANYS, P.C.
                                                        1032 Elwell Court, Suite 100
                                                        Palo Alto, CA  94303
                                                        Tel:  (650) 308-8505
                                                        Fax:  (650) 353-2202

                                                        Timothy Davis (*pro hac vice*)
                                                        tim@hgdlawfirm.com
                                                        HENINGER GARRISON DAVIS LLC
                                                        2224 1st Avenue North
                                                        Birmingham, AL 35203
                                                        Telephone:   (202) 326-3336
                                                        Facsimile:   (205) 326-3332

                                                        Jacqueline Burt (*pro hac vice*)
                                                        James F. McDonough (*pro hac vice*)
                                                        Dara Jeffries (*pro hac vice*)
                                                        jburt@hgdlawfirm.com

jmcdonough@hgdlawfirm.com
dara@hgdlawfirm.com
HENINGER GARRISON DAVIS LLC
3621 Vinings Slope, Suite 4320
Atlanta, Georgia 30339
Telephone:   (404) 996-0861
Facsimile:   (205) 547-5502

Steven W. Ritcheson (State Bar No. 174062)
swritcheson@hgdlawfirm.com
HENINGER GARRISON DAVIS LLC
9800 D Topanga Canyon Blvd. #347
Chatsworth, California 91311
Telephone:   (818) 882-1030
Facsimile:   (818) 337-0383

Attorneys for Plaintiff
POTTER VOICE TECHNOLOGIES LLC